IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CT-3097-BO

| | |
|---|---|
| FERNANDO BUSTILLO,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    O R D E R |
| | ) |
| ART BEELER, et al.,<br>    Defendants. | )<br>)<br>) |

Plaintiff is a federal inmate who filed this action for events occurring while in custody at the Federal Medical Center at Butner, North Carolina ("FMC-Butner") for civil rights violations pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). On March 18, 2010, the court entered an order denying the motion to dismiss the claims about legal and personal mail, its opening, and alleged destruction along with the retaliation claim. (D.E. # 32). The court also denied the motion to dismiss the medical claims with the exception of Defendant Bah who was dismissed from the suit. Id. ("As a commissioned officer in the Public Health Service ("PHS") when treating Bustillo, he asserted and is entitled to absolute immunity."); see 42 U.S.C. § 233(a); Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000); Cook v. Blair, No. 5:02-CT-609-BO, 2003 WL 23857310, *1-2 (E.D.N.C. Mar. 21, 2003); see generally United States v. Smith, 499 U.S. 160, 170 n.11 (1990) (discussing absolute immunity provided to commissioned PHS officers by 42 U.S.C. § 233(a)). On March 28, 2011, the court, granted defendants' first motion for summary judgment based on his failure to exhaust all claims with the exception of the medical claims for which summary judgment was denied. (D.E. # 50). Defendants' next summary judgment was also denied without prejudice. (D.E. #

60). Now before the court is defendants' motion for summary judgment as to the remaining medical claims. (D.E. # 61). Before, reviewing the matter on summary judgment, in an order entered December 1, 2011, the government was directed to re-serve its motion for summary judgment with all attachments and declarations and plaintiff was allowed additional time to respond. (D.E. # 66). The government complied and notified the court of that compliance. (D.E. # 67). The matter is ripe for determination.

## Discussion

I. Motion for Recusal and Motion for Reconsideration

Bustillo has filed both a motion for recusal of a biased and prejudicial judge (D.E. # 68) and a motion for reconsideration (D.E. # 69). These matters shall be considered prior to review of summary judgment. The two filings shall also be considered together because, in essence, Bustillo has filed the same motion twice. However, Bustillo has failed to present any evidence of bias, much less evidence of bias warranting reconsideration pursuant to Federal Rule of Civil Procedure 60(b). See, e.g., White v. Nat'l Football League, 585 F.3d 1129, 1135–36 (8th Cir. 2009); Margoles v. Johns, 660 F.2d 291, 297–98 (7th Cir. 1981) (per curiam); Clayton v. Ameriquest Mortg. Co., 388 F. Supp. 2d 601, 607 (M.D.N.C. 2005), aff'd, 172 F. App'x 479 (4th Cir. 2006) (per curiam) (unpublished); see also Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 871 (4th Cir. 1999). The motions are completely meritless and denied. (D.E. # 68 and # 69).

II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted).

In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. The court can rely on the medical affidavits and prison medical records in ruling on a motion for summary judgment. See generally, Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998); Marshall v. Odom, 156 F. Supp. 2d 525, 530 (D. Md. 2001); Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982).

III. Factual Review

In the light most favorable to plaintiff, the facts are as follows. In November of 2006, Bustillo transferred from the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP-Springfield") to the Federal Medical Center in Butner, North Carolina, ("FMC-Butner") to receive treatment for rectal cancer. (D.E. # 62, Attachment 1, Declaration of

3

Robert Walasin, M.D. ("Walasin Decl."), ¶ 3). On April 3, 2007, plaintiff underwent an abdomino-peritoneal resection at Durham Regional Hospital ("DRH"). (Id., ¶3; Exhibit 1, Medical Records ("Med. Rec."), at 2-4). Dr. W. Woodrow Burns, Jr., M.D., was the performing surgeon. (Id., Med. Rec. at 2). Dr. Burns provides medical services for Bureau of Prisons ("BOP") inmates through a contract with the BOP. (Id., Attachment 3, Declaration of Michelle Smith, ("Smith Decl."), ¶¶ 3-4).

On April 10, 2007, Bustillo was discharged from DRH and returned to FMC-Butner with discharge orders. (Id., Walasin Decl., ¶¶ 3-4; Med. Rec. at 2-4). Upon arrival to FMC-Butner, the on-call physician entered the DRH discharge orders into Bustillo's medical record, and Bustillo was admitted to FMC-Butner's inpatient medical unit for post-operative care. (Id., See Walasin Decl., ¶4; Med. Rec. at 5, 37). The discharge orders prescribed Oxycodone, 10 mg, every four hours, as needed for pain. (Id., Med. Rec. at 37). On April 12, 2007, Dr. Walasin reviewed the DRH discharge orders and co-signed the on-call physician's order implementing such. (Id., Walasin Decl., ¶5; Med. Rec. at 37).

On April 13, 2007, Bustillo was seen by Dr. Walasin during his rounds. Bustillo voiced no complaints and indicated his pain was controlled. Dr. Walasin thus determined continuation of the current treatment plan to be appropriate. (Id., Walasin Decl., ¶5; Med. Rec. at 7). A nursing note dated April 16, 2007, indicated Bustillo was walking around his room without difficulty and was, in all other respects, recovering well from his surgery. (Id., Walasin Decl., ¶6; Med. Rec. at 8). At that point, Dr. Walasin completed a discharge summary which allowed for Bustillo to be moved to the outpatient unit. (Id.; Med. Rec. at 9-10). In this discharge summary, Dr. Walasin noted a follow-up appointment with Dr. Burns had been scheduled. Dr.

4

Walasin indicated Bustillo could receive his meals on the unit for two weeks, not in the cafeteria. After April 16, 2007, Dr. Walasin had no further contact with Bustillo. (Id., Walasin Decl. ¶8.)

As a result of Bustillo's surgery, he had a colostomy bag. As stated in the declaration of Dr. Serrano-Mercado, the colostomy bag serves as an alternative method for intestinal waste disposal, when a portion of a patient's colon is removed. (Id., Attachment 2, Declaration of Maitee Serrano-Mercado, M.D. ("Serrano-Mercado Decl."), ¶3). After Bustillo's transfer to the outpatient unit, Dr. Serrano-Mercado, the outpatient unit physician, continued the Oxycodone, as needed for pain, and prescribed other medications related to his diabetes and other medical issues. (Id., Serrano-Mercado Decl., ¶4; Med. Rec. at 40). The medical records also show Bustillo received a Nutrition Screening and Assessment at which it was determined that his diet was appropriate and no nutritional issues were present at that time. (Id., Med. Rec. at 11-12).

On April 25, 2007, Bustillo's staples were removed from his surgical incision, without complication. (Id., Serrano-Mercado Decl., ¶5; Med. Rec. 14). Bustillo was provided supplies for his colostomy bag and directed to report to nursing staff if he had any concerns. (Id., Med. Rec. at 14).

On April 27, 2007, Dr. Burns conducted a post-operative checkup, noting that Bustillo's incisions were satisfactory, without inflammation or infection, and the colostomy was also functioning satisfactorily. Dr. Burn's recommended a review of Bustillo's diet, indicated he could return to the clinic as needed, and recommended follow-up labs and x-rays in three months. (Id., Serrano-Mercado Decl. ¶5; Med. Rec. 15, 53).

5

Case 5:08-ct-03097-BO   Document 70   Filed 01/19/12   Page 5 of 19

On May 15, 2007, Bustillo had an oncology visit, after failing to report for a visit a few days earlier. (Id., Med. Rec. at 15). Bustillo reported he felt normal and had no complaints. His physical exam was normal, and he was scheduled to return for follow-up in three months. (Id.)

On June 15, 2007, Dr. Serrano-Mercado saw Bustillo during a routine chronic care visit. At that time, Bustillo complained of occasional discomfort when urinating. Dr. Serrano-Mercado's physical exam and review of his symptoms indicated that Bustillo's colostomy was functioning well and his hypertension and diabetes were well controlled. Dr. Serrano-Mercado ordered a PSA screening and Urinalysis, but proposed no changes to the current treatment plan. A follow-up visit was planned for two to three months. (Id., Serrano-Mercado Decl., ¶ 7a (first paragraph labeled 7); Med. Rec. at 16).

Bustillo continued to be followed by Oncology staff and in the Chronic Care Clinic. Medical records also indicate he did not attend all of his scheduled appointments, and occasionally displayed some behavioral problems. (Id., Serrano-Mercado Decl., ¶6; Med. Rec. 15, 17-18).

On August 30, 2007, Bustillo reported to sick call. He complained of two lumps in his abdomen which were sometimes sore. A Physician Assistant examined him and noted potential hernias. The Physician Assistant also noted slightly elevated blood pressure. (Id., Serrano-Mercado Decl. ¶ 7b (second paragraph labeled 7); Med. Rec. at 18). On September 6, 2007, Dr. Serrano-Mercado had a follow-up examination with Bustillo. Dr. Serrano-Mercado noted a palpable hernia, but Bustillo reported no pain generally, and it was not tender to the touch. (Id., Serrano-Mercado Decl., ¶8; Med. Rec. at 20-21). Dr. Serrano-Mercado suspected the elevated blood pressure of Bustillo to be related to weight gain, and determined it was

6

appropriate to add blood pressure medication to the treatment plan. All other aspects of the plan were to remain the same. (Id.).

On September 25, 2007, Bustillo reported to sick call complaining of pain from the hernia and of bleeding at his colostomy site. The Physician Assistant inspected the hernia and was able to reduce it with pressure. The declaration of Dr. Serrano-Mercado states that this indicates there was no constriction of the intestine and thus no risk of complications from intestinal infarct, which is a restriction of the intestinal blood supply. The Physician Assistant ordered a binder belt to help keep the hernia reduced. The Physician Assistant also educated Bustillo about cleaning his colostomy site. (Id., Serrano-Mercado Decl., ¶9; Med. Rec. at 22).

On December 5, 2007, Bustillo had an Oncology visit, at which it was noted Bustillo's abdominal hernia was large. The Oncologist, Dr. Andes, sought further consultation. (Id., Serrano-Mercado Decl., ¶10; Med. Rec. at 23). The record indicates Bustillo refused his next chronic care visit and surgical consult review on January 15, 2008. (Id., Serrano-Mercado Decl.,¶11; Med. Rec. at 24, 55). On January 18, 2008, Dr.Serrano-Mercado noted that Bustillo had an incisional hernia, which was large, but "nontender" and easily reducible. It was her clinical impression that surgical repair of the hernia was not indicated unless it was clearly symptomatic, as the surgery could be complicated by the presence of the colostomy. (Id., Serrano-Mercado Decl., ¶11; Med. Rec. at 25). She scheduled a follow-up with the surgeon in two months to determine whether further intervention was necessary. (Id.).

On April 12, 2008, Bustillo failed to show for his scheduled chronic care clinic visit with Dr. Serrano-Mercado. (Id., Serrano-Mercado Decl. ¶12; Med. Rec. at 27). On April 17, 2008, Bustillo attended his scheduled surgical consultation with Dr. Burns. (Id., Serrano-Mercado

7

Decl., ¶13; 51). Dr. Burns confirmed the diagnosis of an incisional hernia. He noted Bustillo reported the hernia caused daily discomfort, but did not interfere with the colostomy. Dr. Burns reported the hernia was still reducible and was not an emergency. Dr. Burns indicated repair of the hernia under general anesthesia could be performed. (Id.).

After reviewing the consultation report, Dr. Serrano-Mercado again determined that surgical repair of the hernia was not medically necessary, but would be an elective surgery. (Id., Serrano-Mercado Decl., ¶14; Med. Rec. at 27).

On April 30, 2008, the matter was presented to the Utilization Review Committee. Upon review, the committee agreed that surgical repair of the hernia was not medically necessary and therefore did not approve surgery for Bustillo. (Id., Serrano-Mercado Decl., ¶14; Med. Rec. at 56).

In April of 2008, Dr. Serrano-Mercado was reassigned to another facility in FCC-Butner, and had no further clinical interaction with Bustillo. (Id., Serrano-Mercado Decl., ¶ 15). Medical records indicate Bustillo continued to receive medical care for high blood pressure and diabetes, and received conservative treatment for his hernia. In June of 2008, Bustillo was seen twice by a Physician Assistant, who documented working with Bustillo to find the preferred pain medication for treatment of the symptoms related to his hernia. (Id., Serrano-Mercado Decl., 15; Med. Rec. at 30).

On August 13, 2008, Bustillo was transferred from FMC-Butner to another facility in Butner and then on September 24, 2008, Bustillo was transferred back to USMCFP-Springfield. (Id., Serrano-Mercado Decl., ¶16; Med. Rec. at 34, 36).

8

IV. Legal Discussion

The following issues remains before the court for resolution: did Defendant Burns misuse surgical procedures inducing a hernia condition resulting in deliberate indifference (D.E. #17 at 4); following the surgery, did defendant Walasin force Bustillo to walk to the dining room for meals despite Bustillo's pain and also deny the administration of pain medication resulting in deliberate indifference (D.E. #17 at 4.); did defendants Moritsugu, Andes, Serrano-Mercado and Bonner deny Bustillo corrective surgery to repair the hernia resulting in deliberate indifference (D.E. #17 at 4, 4A and 4C); and did defendant Serrano-Mercado deny Bustillo pain medication resulting in deliberate indifference . (D.E. #17 at 4).

To establish an Eighth Amendment claim for denial of medical care, a prisoner must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quotation omitted).

Deliberate indifference requires that a defendant knew of and purposefully ignored "an excessive risk to inmate health or safety . . . ." Farmer v. Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. "[O]bduracy and wantonness, not inadvertence or error in good faith, . . . characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241.

9

"[T]o establish a claim of deliberate indifference to [a] medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

   i. Dr. Burns

Dr. Burns may be seeking dismissal on the ground that Bustillo failed to effect proper service of the complaint and summons upon him. See, Mem. in Supp. of Motion for Summ. J., p. 4-5, fn. 1, but see fn. 4. Proper service of process (or waiver of service under Fed. R. Civ. P. 4(d)) is necessary for the court to exercise personal jurisdiction over a defendant. See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350 (1999). Under Rule 4(m), if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court must dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time, unless the plaintiff can show good cause. Fed. R. Civ. P. 4(m). Rule 4(e)(1) permits a plaintiff to serve individual defendants "pursuant to the law of the state in which the district court is located." Fed. R. Civ. P. 4(e)(1). The North Carolina Rules of Civil Procedure permit service "[b]y mailing a copy of the summons and of the complaint, registered or certified mail, return receipt requested, addressed to the party to be served, and delivering to the addressee." N.C. Gen. Stat. § 1 A-1, Rule 4(j)(1)(c). A plaintiff may deliver the documents to defendant's place of employment. See id.; Moore v. Cox, 341 F. Supp. 2d 570, 573 (M.D.N.C. 2004); Waller v. Butkovich, 584 F. Supp. 909, 926 (M.D.N.C. 1984).

When a defendant challenges service by certified mail, a plaintiff must submit an affidavit stating that a copy of the summons and complaint was mailed and attach the return

10

receipt indicating that service was received in accordance with N.C. Gen. Stat. § 1-75.10(4). See Moore, 341 F. Supp. 2d. at 573. If the attached return receipt was signed by a person other than the addressee, North Carolina presumes "that the person who received the mail . . . and signed the receipt was an agent of the addressee authorized by appointment or by law to be served or to accept service of process." N.C. Gen. Stat. § 1A-1, Rule 4(j2)(2); see Moore, 341 F. Supp. 2d. at 573; Fender v. Deaton, 130 N.C. App. 657, 662, 503 S.E.2d 707, 710 (1998). A party may rebut this presumption of valid service with "affidavits of more than one person showing unequivocally that proper service was not made upon the person of the defendant." Grimsley v. Nelson, 342 N.C. 542, 545, 467 S.E.2d 92, 94 (1996); see Moore, 341 F. Supp. 2d at 573.

There is no showing of improper service. On April 21, 2009, the United States Marshal filed a return of service on Dr. Burns indicating service on him via certified mail, return receipt requested. The attached return receipt shows that the delivery was accepted by "T. P. Baker" who, under North Carolina law, is presumed to be Burn's agent for service of process. No affidavit challenging the service has been filed. Because Burns has not overcome the presumption of valid service under North Carolina law, the court denies his motion to dismiss without prejudice based on improper service. Moreover, by failing to raise the issue of improper service such a defense has been waived. Fed. R. Civ. P.12(b) and (h); see docket. The court also notes that in footnote 2 of the first Memorandum of Law in Support of Defendant's Motion for Summary Judgment (D.E. # 41) the government states that "Butner medical personnel includes . . . Walter Woodrow Burns, Jr. . . ."

Thus the court turns to the issue of deliberate indifference as to the surgical procedure performed by Dr. Burns. First, in this last memorandum of law, it appears through discovery and

11

the record that Dr. Burns is a private surgeon practicing medicine at Durham Regional Hospital. He does have, as stated in the record, a contractual relationship with the BOP to provide medical care to BOP inmates. Furthermore, as stated in prior filings, and the previous paragraph, Dr. Walter Burns was at some point either correctly, or mistakenly, considered by the government to be medical personnel at Butner. Therefore, it shall be assumed without deciding that Dr. Burns may be sued under Bivens. See West v. Atkins, 487 U.S. 42, 54 (1988).

Bustillo has failed to show deliberate indifference by this surgeon, Dr. Burns. He argues that the surgery on April 3, 2007, resulted in a hernia. However, there is no indication from the medical records that a hernia resulting from colon surgery rises to the level of deliberate indifference.

What is clear is that four months after colon cancer surgery, Bustillo developed a hernia. Bustillo was continuously seen by numerous medical professionals from the time he arrived at FMC-Butner for rectal cancer treatment through his return from surgery and throughout his incarceration at FMC-Butner. No medical records indicate anything to the contrary. Specifically, Bustillo was transferred to FMC-Butner in November of 2006 to receive treatment for colon cancer. Dr. Burns performed surgery on April 3, 2007, and the records indicate the surgery was successful. Furthermore, there was a detailed post-surgical discharge summary. Bustillo was admitted to a special unit within FMC-Butner for post-surgical care. He was monitored carefully. He was also seen regularly by numerous doctors and medical staff at the outpatient medical/surgical unit other than the performing surgeon, Dr. Burns. All indications were that Bustillo continued to be in stable condition and healing well throughout his recovery. Upon transfer out of the special medical unit at FMC-Butner, Bustillo continued to have follow-

12

ups from Oncology, Dr. Burns, as well as other medical personal concerned with his continued medical care. If the hernia is the direct result of the surgery, at most an action might lie in negligence. However, mere negligence in diagnosis or treatment does not state a constitutional claim. Estelle, 429 U.S. at 105–06. Without more, his claim against Dr. Burns fails.

ii. Dr. Walasin

The claim against Dr. Walasin is that Dr. Walasin forced Bustillo to walk to and from the dining room for meals. Again, this claim is unsupported by the medical record. As stated above, on April 10, 2007, Bustillo was discharged from DRH and returned to FMC-Butner with discharge orders. These orders were entered into Bustillo's medical record and Bustillo was admitted to FMC-Butner's inpatient medical unit for post-operative care. The discharge orders prescribed Oxycodone, 10 mg, every four hours, as needed for pain. On April 12, 2007, Dr. Walasin reviewed the DRH discharge orders and co-signed the on-call physician's order implementing such.

On April 13, 2007, Bustillo was seen by Dr. Walasin during his rounds. Bustillo voiced no complaints and indicated his pain was controlled. Dr. Walasin thus determined continuation of the current treatment plan to be appropriate. A nursing note dated April 16, 2007, indicated Bustillo was walking around his room without difficulty and was, in all other respects, recovering well from his surgery. At that point, Dr. Walasin completed a discharge summary which allowed for Bustillo to be moved to the outpatient unit. (Id.,; Med. Rec. at 9-10). In this discharge summary, Dr. Walasin noted a follow-up appointment with Dr. Burns had been scheduled. Dr. Walasin indicated Bustillo could receive his meals on the unit for two weeks, not in the cafeteria. After April 16, 2007, Dr. Walasin had no further contact with Bustillo.

13

Based on the medical records, no deliberate indifference on the part of Dr. Walasin has been shown. During the six days of Dr. Walasin's care of Bustillo, Bustillo was monitored under that of the post-surgical care ordered by the surgeon from DRH. The record further shows Dr. Walasin recommend continued pain medication and the receipt of meals on the unit for a continued two weeks after discharge, not in the cafeteria. The claim fails.

iii. Defendants Moritsugu, Andes, Serrano-Mercado and Bonner

Plaintiff alleges defendants Moritsugu, Andes, Serrano-Mercado, and Bonner violated his constitutional rights by not authorizing a surgical repair of the incisional hernia that developed following plaintiff's surgery.

First, the court reviews the motion for summary judgment as to both Moritsugu and Andes. In Bustillo's amended complaint, defendant Moritsugu is identified as the Medical Director of the Bureau of Prisons and defendant Andes as a Doctor. (Pl.'s Amend. Compl. at 3b). Bustillo offers no indication of each of these defendants roles, if any, in his medical care or how, if at all, they influenced the treatment decisions related to Bustillo's hernia. (Pl.'s Amend. Compl. at 4c).

"In a Bivens suit, there is no respondeat superior liability. Instead, liability is personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (citation omitted); Iqbal, 129 S. Ct. at 1949 ("In a . . . Bivens action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). The record before the court establishes no

14

personal involvement in the decision regarding Bustillo's hernia surgery by Defendants Moritsugu and Andes and neither defendant is liable under Bivens for any such claims.

Specifically, Bustillo show failed to show, and the record is devoid of, any evidence Moritsugu had any role in the treatment decisions, except based on respondeat superior. The record further indicates Defendant Andes' role was to provide Bustillo cancer treatment through regular oncology visits. See Med. Rec. at 26, 31, 32-33, 42, 45, 48. Defendant Andes' involvement regarding hernia treatment was simply his referral of the matter to other medical providers.

Because the record shows no personal involvement in the medical decisions as they relate to Bustillo's hernia treatment, Defendants Moritsugu and Andes cannot be held liable under Bivens.

As for the allegations against defendants Serrano-Mercado and Bonner which claim constitutional violations by not authorizing a hernia repair surgery, these too are dismissed. (Pl.'s Amend. Compl. at 4, 4a, 4c). As an addition claim, Bustillo argues that Dr. Serrano-Mercado denied plaintiff medication to alleviate severe pain. (Pl.'s Amend. Compl. at 4). Bustillo's medical records establish, however, that Defendants Serrano-Mercado provided Bustillo with proper medical care and that Dr. Serrano-Mercado's decision as a part of the Utilization Review Board was not deliberately indifferent to Plaintiff's medical condition.

Bustillo first presented with complaints about a hernia in late August 2007. The Physician Assistant that examined Bustillo identified a reducible hernia. A Physician Assistant examined him and noted potential hernias. The Physician Assistant also noted slightly elevated blood pressure. On September 6, 2007, Dr. Serrano-Mercado had a follow-up examination with

15

Bustillo and noted a palpable hernia, but Bustillo reported no pain generally, and it was not tender to the touch. Dr. Serrano-Mercado suspected the elevated blood pressure of Bustillo to be related to weight gain, and determined it was appropriate to add blood pressure medication to the treatment plan. All other aspects of the plan were to remain the same.

On September 25, 2007, Bustillo reported to sick call complaining of pain from the hernia and of bleeding at his colostomy site. The Physician Assistant inspected the hernia and was able to reduce it with pressure, indicating there was no constriction of the intestine and thus no risk of complications from intestinal infarct, which is a restriction of the intestinal blood supply. The Physician Assistant ordered a binder belt to help keep the hernia reduced. The Physician Assistant also educated Bustillo about cleaning his colostomy site.

On December 5, 2007, Bustillo had an Oncology visit, at which it was noted Bustillo's abdominal hernia was large. The Oncologist, Dr. Andes, sought further consultation.

The record indicates Bustillo refused his next chronic care visit and surgical consult review on January 15, 2008. On January 18, 2008, Dr. Serrano-Mercado noted that Bustillo had an incisional hernia, which was large, but "nontender" and easily reducible. It was her clinical impression that surgical repair of the hernia was not indicated unless it was clearly symptomatic, as the surgery could be complicated by the presence of the colostomy. She scheduled a follow-up with the surgeon in two months to determine whether further intervention was necessary.

On April 12, 2008, Bustillo failed to show for his scheduled chronic care clinic visit with Dr. Serrano-Mercado. On April 17, 2008, Bustillo attended his scheduled surgical consultation with Dr. Burns who confirmed the diagnosis of an incisional hernia. He noted Bustillo reported

16

the hernia caused daily discomfort, but did not interfere with the colostomy. Dr. Burns reported the hernia was still reducible and was not an emergency. Following the consultation, Dr. Serrano-Mercado referred the matter to the Utilization Review Committee to determine whether the hernia surgery was to be approved. The committee concluded that the repair was not medically necessary and, therefore, did not approve the surgery.

The medical records illustrate a consistent and systematic process of care, professional attention and assessment to Bustillo's hernia condition, as well as, his overall medical care. The Physician Assistant initially identified the condition and provided remedial care with a binder belt. Throughout examination of the hernia it presented as reducible, did not pose a threat of complications, and did not present an emergency case in the opinion of each care provider. Dr. Serrano-Mercado evaluated the condition, referred the matter to a consulting surgeon, and sought review of the case by the Utilization Review Committee. Based on the clinical data, Dr. Serrano-Mercado and Dr. Bonner, in his role as Utilization Committee Chairperson, determined that the surgery was not medically necessary. Lastly, the record further demonstrates that medical staff continued to work with Bustillo to provide conservative care for the hernia condition.

Bustillo's disagreement with his medical care, specifically, the denial of non-emergent hernia surgery is a disagreement between an inmate and a physician over the inmate's proper medical care and does not constitute deliberate indifference.; Webb v. Hamidullah, 281 F. App'x 159 (4th Cir. 2008) (per curiam) (unpublished); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

17

Furthermore, while the Eighth Amendment may be violated when, without explanation, an administrator charged with reviewing and approving requested medical treatment refuses to approve the treatment that the prisoner's treating physician or specialist requests such is not the situation presented today. See Arnett v. Webster, No. 09-3280, 2011 WL 4014343, at *8–9 (7th Cir. Sept. 12, 2011); Johnson v. Wright, 412 F.3d 398, 404 (2d Cir. 2005). Here, the evidence taken in the light most favorable to Bustillo shows that there is no genuine issue of material fact as to whether Dr. Bonner was deliberately indifferent to Bustillo's serious medical needs in his decision as it related to the Utilization Review Board's denial to approve surgery. Rather, the record reflects a disagreement between medical professionals on the appropriate course of treatment. Such a disagreement does not reflect deliberate indifference. See, e.g., United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011); Wright, 766 F.2d at 849.

Based on the above, summary judgment should be allowed for Defendant Serrano-Mercado and Bonner because they were not deliberately indifferent to Bustillo's medical conditions.

iv. Dr. Serrano-Mercado denied Bustillo pain medication.

Likewise Bustillo's allegation that Dr. Serrano-Mercado denied plaintiff his pain medication is unsupported by the medical record. The record demonstrates that upon discharge from the inpatient unit, Dr. Serrano-Mercado continued the pain medication, Oxycodone, which Plaintiff received upon his discharge from DRH and while he was on the inpatient unit. Several weeks later, Dr. Serrano-Mercado extended the same medication for another thirty days.

Based on the medical record, summary judgment is granted for Defendant Serrano-Mercado in that she was not deliberately indifferent in the alleged denial of pain medication.

V.   Conclusion

Accordingly, for the above stated reasons both plaintiff's motion for recusal and motion for reconsideration are DENIED (D.E. # 68 and 69). Defendants' motion for summary judgment is GRANTED (D.E. # 61). The Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this the __15__ day of January 2012.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE